# Illinois Official Reports

## Appellate Court

---

### *People v. Rainey*, 2019 IL App (1st) 160187

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VIDAL RAINEY, Defendant-Appellant. |
| District & No. | First District, Third Division<br>No. 1-16-0187 |
| Filed<br>Rehearing denied | November 27, 2019<br>January 22, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 12-CR-15811, 12-CR-15812 12-CR-15813, 12-CR-15184, 12-CR-15815, 12-CR-15833, 12-CR-15834, 12-CR-15835, 12-CR-15836, 12-CR-15837, 12-CR-15838, 12-CR-15839, 12-CR-16208, 12-CR-16209, 12-CR-16210, 12-CR-16212, 12-CR-16213, 12-CR-16214, 13-CR-5854; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Tiffany Boye Green, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and John E. Nowak, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Cobbs concurred in the judgment and opinion.

## OPINION

¶ 1        Defendant Vidal Rainey twice waived his right to counsel and, for a time, went *pro se*. He revoked his first waiver after a month of going it alone; his second waiver, after two weeks. When defendant demanded to represent himself a third time, on the eve of trial, the judge said no. With his trial imminent, and his unwanted public defender at the helm, defendant pleaded guilty to a raft of serious offenses, charged in 19 separate cases, all arising from his alleged crime spree in the summer of 2012.

¶ 2        Defendant then moved to withdraw his guilty pleas. Those pleas were involuntary, he argued, because his request for a third go at self-representation was improperly denied, thus saddling him with the choice between pleading guilty or putting his trial in the hands of an attorney he did not trust and did not want. The trial court denied the motion and explained, in a written postplea order, why it had denied defendant's request for self-representation. On appeal, defendant contests that ruling and asks us to vacate his guilty pleas.

¶ 3        Defendant tested the limits of the trial judge's forbearance with antics that were, by turns, dilatory, obstructionist, and deeply offensive. We commend the judge's patience and scrupulous concern, through it all, for defendant's sixth-amendment rights. And while defendant correctly argues that some of the rationales offered in the court's postplea order violate settled sixth-amendment principles, we find that the record amply supports the denial of his third request for self-representation. Indeed, the trial court made factual findings in the postplea order that justify its ruling, even if defendant is correct that those factual findings were not always properly tied into the court's (sometimes flawed) legal analysis.

¶ 4        For one thing, we agree that defendant's request was one more example of his "constant efforts to delay the proceedings" and throw a monkey wrench into his prosecution. His pattern of *temporarily* waiving counsel, only to ask for counsel back at the very next court date, made clear that he had no intention of seeing his own representation through. The inevitable result, if not the point, of his request was to delay his impending trial—just as he had done before. What's more, defendant's disruptive, recalcitrant, and offensive behavior whenever he represented himself in a hearing betrayed his inability to conduct his own trial with civility and decorum. Because defendant's request was properly denied, he cannot show that his guilty pleas were involuntary.

## BACKGROUND

¶ 6        Defendant racked up 19 indictments, charging him with aggravated criminal sexual assault, aggravated kidnapping, numerous armed robberies, attempted home invasion, residential burglary, battery of a police officer, and other offenses. For the first year or so of proceedings in the trial court, defendant was represented by private counsel. When that relationship soured, in August 2013, the trial court granted private counsel's motion to withdraw and appointed the public defender's office. Assistant Public Defender (APD) Armando Sandoval took over defendant's cases.

¶ 7        APD Sandoval had defendant evaluated by a forensic psychologist. The parties stipulated that defendant was found fit to stand trial in January 2014. At the same hearing, defendant pleaded guilty to delivery of a controlled substance. (That plea is not at issue in this appeal.) But he rejected the State's offer of an aggregate, below-the-minimum sentence of 40 years, in exchange for his guilty pleas in his remaining cases, which are at issue here. And he complained that his attorney had not shared any discovery with him. APD Sandoval explained that he had tried to visit the day before, but he was unable to locate defendant in the jail at that time. He assured defendant that he would visit again to review the discovery. Unassuaged, defendant invoked his right of self-representation.

¶ 8        The trial judge warned defendant about the perils of self-representation, explained that defendant would not have standby counsel or be permitted to change his mind during trial, and admonished defendant about the charges and penalties in the State's elected case. Defendant said he understood all of this, and the judge accepted his waiver of counsel, finding it knowing, voluntary, and intelligent.

¶ 9        Exactly one month later, at the start of the next status hearing, defendant told the judge that he "rethought [his] situation." He no longer wanted to represent himself, but he did not want a public defender, either; instead, he wanted a "bar association lawyer." But as the judge explained to him, the court had no authority to appoint private counsel unless the public defender's office had a disabling conflict, and in this case, it did not. So defendant could have a public defender, or he could represent himself. He chose a public defender, and APD Sandoval was reappointed.

¶ 10        That appointment lasted about six months. On September 8, 2014, the parties appeared for a final pretrial conference. Defendant demanded a second fitness evaluation. In response to the judge's inquiry, APD Sandoval said that he did not see any *bona fide* issue as to defendant's fitness, nothing of note having changed, from his perspective, since the last fitness evaluation in January of that year. The judge denied defendant's request, and defendant immediately invoked his right of self-representation again.

¶ 11        As the judge noted, defendant purported to question his own fitness to *stand* trial, yet he now insisted on *conducting* his trial himself. And this after acknowledging, the last time around, that self-representation "wasn't going to be a good idea." Still, the judge obliged, while also reminding defendant that his right to change his mind was not without its limits: "[W]e can go through this process again, but that will be it. We will not go back and forth." If defendant chose to represent himself again, he would have to do so until the "conclusion of trial at a minimum." Defendant held fast, and after a fresh round of admonishments, the judge accepted his second waiver of counsel.

¶ 12        Defendant's first move was to ask for a transfer to Cook County Jail. Apparently he did not have phone privileges in prison, which would make it that much more difficult for him to prepare his own defense. The judge denied his request, explaining that defendant was legally required, in his particular circumstances, to remain in the custody of the Department of Corrections.

¶ 13        With the trial date only three weeks away, and appointed counsel now out of the picture, the prosecutor tried to give defendant copies of the State's motions *in limine* and proposed jury instructions. But defendant up and left the courtroom. When security brought him back to the courtroom, defendant launched into an offensive and highly demeaning tirade against the

judge, calling him a "nigger," a "fucking faggot," and verbally abusing him in other ways that we will describe in more detail later on.

¶ 14    The trial court tried to complete the final pretrial conference a week later, on September 15, 2014. Defendant appeared *pro se* and in shackles. He filed another motion to appoint a private attorney, which the trial court denied. Defendant later announced that that he would hire a private attorney. That was fine, the judge said, as long as the attorney would be ready for trial as scheduled—on September 29, 2014, which was just two weeks away. Defendant objected that the judge was "forcing [him] to trial," and he demanded to have his case transferred to a different courtroom, where his request for an extension would be accommodated. The judge denied that request and reiterated numerous times that defendant's trial would commence as scheduled. Defendant insisted, at least as many times, that he would not start trial on September 29. And he continued to demand another fitness evaluation.

¶ 15    Defendant's conduct and attitude toward the judge, throughout the hearing, defies concise paraphrase. So we will describe it in proper detail later, as our analysis demands it. Suffice it to say for now that defendant continued to verbally abuse the judge, disrespect the court, and stonewall the proceedings by refusing to cooperate even minimally. And he purported to blame the judge for his alleged inability to cooperate, arguing that his wrist shackles made it impossible for him to access his papers, even though it was clear to the judge that he was perfectly capable of turning the pages when he wanted to. The judge warned him that his conduct was jeopardizing not only his right to represent himself but also his right to be *present* at trial.

¶ 16    Eight days later, on September 23, 2014—at what was supposed to be the final status hearing before trial—defendant asked the trial court to reappoint the public defender's office. The judge agreed and struck the impending trial date.

¶ 17    APD Sandoval renewed defendant's request for a second fitness evaluation, arguing that defendant's conduct at the September 8, 2014, hearing was so out of character that it raised new concerns about his mental status. The judge was skeptical that defendant's conduct had anything to do with mental illness, given that he suddenly started throwing "temper tantrums" shortly after his *pro se* requests (for a fitness evaluation and a transfer to the county jail) were denied. But the judge agreed, perhaps out of an abundance of caution, to order a second evaluation. A few weeks later, the parties stipulated that defendant was found fit to stand trial.

¶ 18    On the next court date, intended to be the final pretrial conference, defendant complained to the judge that there was "a conflict of interest between me and my attorneys," meaning that they were "not on the same page" about matters of strategy. The judge told defendant to take up the issue again with counsel. The court heard arguments on several motions, and responses to State motions, that APD Sandoval had filed since being reappointed. With a jury trial upcoming, on January 5, 2015, one last status date was scheduled for December 19, 2014.

¶ 19    At the outset of that status hearing, defendant tried to file two *pro se* motions, including one to discharge his attorney. When the judge told him that he could not file any *pro se* motions while he was represented by counsel, defendant said that he would simply discharge counsel on his own. The judge responded, "No, you're not. Your request for—to proceed *pro se*, again, for the third time, is denied. You had the opportunity to go *pro se*." And, the judge added, "It is clear to the Court *** that you are not capable of representing yourself."

¶ 20    Defendant's second *pro se* motion, a motion to quash arrest and suppress evidence, was not filed either, as counsel reviewed the motion and determined that it lacked a good-faith

basis. As the judge turned to APD Sandoval to discuss some other pretrial matters, defendant repeatedly insisted, "He is not representing me."

When the trial date arrived, counsel sought a continuance, for the purpose of amending a previously filed motion to exclude some of defendant's alleged statements. During discussion of the issues raised in that motion, counsel asked to pass the case. When the parties came back on the record, counsel informed the court that defendant had accepted a plea offer. The trial court admonished defendant and found that his guilty pleas, entered in exchange for an aggregate sentence of 40 years, were knowing and voluntary.

Defendant timely filed a *pro se* motion to withdraw his guilty pleas. After the trial court denied that motion, the public defender filed a motion to reconsider, arguing that the court had failed to appoint postplea counsel, pursuant to Illinois Supreme Court Rule 604(d) (eff. Jan. 1, 2013). The trial court then appointed a new assistant public defender, who filed a Rule 604(d) certificate and an amended motion to withdraw defendant's pleas. Among other things, the motion argued that the trial court erred in denying defendant's request to represent himself based on his lack of legal ability and that the denial of his right to self-representation rendered his pleas involuntary. The trial court denied the amended motion and issued a written postplea order. This appeal followed.

ANALYSIS

Defendant argues that the trial court improperly denied his request for round three of self-representation. As a result, he was forced to choose between pleading guilty and going to trial with an unwanted attorney in charge of his defense. Because that rendered his guilty pleas involuntary, he should be allowed to withdraw them and represent himself at a trial.

I

One preliminary point. Defendant's request to withdraw his guilty pleas assumes that the following argument is valid: If his request to waive counsel (a third time) was improperly denied, the resulting deprivation of his sixth-amendment right of self-representation rendered his guilty pleas involuntary. The basic idea is that the pleas were coerced, as it were, by depriving him of his fundamental right of self-representation.

That is, by no means, an obvious proposition. And it appears to be an issue of first impression for Illinois courts. Neither party cites, and we have not found, any Illinois case that answers the question presented head-on. Defendant does cite a handful of Illinois cases in which guilty pleas were found involuntary, but not one of those cases addresses the issue presented here or merits any detailed discussion.

The federal courts of appeals have split on this question. One circuit, in a case defendant cites, has held that a denial of the right of self-representation automatically renders a guilty plea involuntary. *United States v. Hernandez*, 203 F.3d 614, 626 (9th Cir. 2000).

Other circuits have held either that it does not or that a defendant who pleads guilty waives any challenge to the alleged error. *United States v. Dewberry*, 936 F.3d 803, 805-06 (8th Cir. 2019); *United States v. Montgomery*, 529 F.2d 1404, 1406-07 (10th Cir. 1976) (contrary rule would "open the door to manipulations and gamesmanship"); see also *Gomez v. Berge*, 434 F.3d 940, 942-43 (7th Cir. 2006) (by pleading guilty, defendant waived argument that he was incompetent to represent himself).

¶ 30    Defendant's contention is at least an arguable one; "fairminded jurists could disagree," and have disagreed, about its legal merits. See *Werth v. Bell*, 692 F.3d 486, 497 (6th Cir. 2012) (declining to answer this question where appeal could be resolved on other grounds). And the State makes no effort to dispute it. But the State's acquiescence does not bind us; it just leaves the issue unjoined and largely unbriefed. See *People v. Horrell*, 235 Ill. 2d 235, 241 (2009) (reviewing court not bound by party's concession).

¶ 31    Because we ultimately conclude that the trial court properly denied defendant's request, we think this question is best left for another day, when it has been fully briefed and is necessary to the resolution of the appeal. For now, we will assume without deciding that defendant's guilty pleas would be involuntary if his request to represent himself was improperly denied.

¶ 32                                              II

¶ 33    We turn to defendant's claim of error in the trial court's denial of his request for self-representation. We review that ruling for an abuse of discretion. *People v. Burton*, 184 Ill. 2d 1, 25 (1998); *People v. Hunt*, 2016 IL App (1st) 132979, ¶ 16. A court abuses its discretion when its ruling is "arbitrary and without a logical basis." *Hunt*, 2016 IL App (1st) 132979, ¶ 16.

¶ 34                                              A

¶ 35    When defendant asked for a third crack at self-representation, the judge told him, "It is clear to the Court *** that you are not capable of representing yourself." Defendant's arguments on appeal focus principally on this statement. And it warrants an extended discussion, as the statement is more nuanced than it might appear, given the court's later explanation of its meaning in the postplea order. But first, we turn to what the court identified, in that postplea order, as the "actual basis" for denying defendant's request: that it was not a "clear and unequivocal" waiver of his right to counsel.

¶ 36    The trial court was correct, of course, that a waiver of counsel must be "clear and unequivocal, not ambiguous." *People v. Baez*, 241 Ill. 2d 44, 116 (2011); see also *Faretta v. California*, 422 U.S. 806, 835 (1975). A criminal defendant has two mutually exclusive sixth-amendment rights—the right to assistance of counsel and the right of self-representation. Given our concern for the protection of a defendant's fundamental right to a fair trial, our system defaults to assistance of counsel and will indulge every reasonable presumption *against* waiver of counsel. *Brewer v. Williams*, 430 U.S. 387, 404 (1977); *Burton*, 184 Ill. 2d at 22. So defendants who wish to depart from that default option must say so "clear[ly] and unequivocal[ly]." *Burton*, 184 Ill. 2d at 22; *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992).

¶ 37    The requirement of clarity prevents gamesmanship. By requiring a defendant to be clear about a request for self-representation, we forestall any " 'effort to sandbag the court and the opposition, to seek an acquittal with an ace up the sleeve to be whipped out in the event of conviction.' " *Burton*, 184 Ill. 2d at 22 (quoting *Cain*, 972 F.2d at 750); see also *United States v. Tompkins*, 623 F.2d 824, 828 (2d Cir. 1980) (requirement prevents defendant from "consciously scheming to create a ground for reversal").

¶ 38    If an ambiguous request or mere reference to self-representation were enough, a defendant could place the trial court in a trick bag of sorts: If the court responded to the defendant's

statement by leaving appointed counsel in place, the defendant could claim on appeal that his right of self-representation was violated; if the court responded by dismissing counsel and allowing the defendant to proceed *pro se*, the defendant could claim his right to *counsel* was violated. In other words, no matter how the trial judge resolved the ambiguity in the defendant's statements, the defendant would always have a colorable argument on appeal that the resolution violated one of his sixth-amendment rights and thus that he is entitled to another chance to seek an acquittal with his preferred representation. See *Burton*, 184 Ill. 2d at 22.

¶ 39    The requirement of a clear waiver thus prevents a defendant from weaponizing his sixth-amendment rights on appeal. If the defendant is silent on, or ambiguous about, his desire to represent himself, his right of self-representation has not been violated; the rules at trial and on appeal are known from the start. See *Baez*, 241 Ill. 2d at 116; *People v. Mayo*, 198 Ill. 2d 530, 538 (2002); *Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989).

¶ 40    So if a defendant raises the notion of self-representation in a way that falls short of a clear request to invoke that right, the court does not abuse its discretion in leaving the default option of counsel in effect. See, *e.g.*, *Burton*, 184 Ill. 2d at 21-23; *People v. Brooks*, 75 Ill. App. 3d 109, 110 (1979) (defendant did not waive counsel when he stated that he did not need counsel " 'at this present time' " in order to avoid continuance at preliminary hearing and never renewed request); *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir. 1991) (defendant did not invoke right to self-representation through isolated, offhand statement expressing frustration at trial court's denial of request for new counsel).

¶ 41    With all of this in mind, we turn to the December 19, 2014, hearing, where the trial court denied defendant's third request for self-representation, to determine whether defendant's request was clear.

¶ 42    At the start of that hearing, defendant tried to file two *pro se* motions, including one to discharge counsel, but the court told him he could not file *pro se* motions while represented by counsel. Defendant said, "Okay, then I am discharging him." The court replied, "No, you're not. Your request for—to proceed *pro se*, again, for the third time, is denied. You had the opportunity to go *pro se*." Only moments later, the court and defendant engaged in this back-and-forth exchange:

> "THE DEFENDANT: He not [*sic*] representing me no more.
> THE COURT: He represents you.
> THE DEFENDANT: He not [*sic*] representing me.
> THE COURT: Well, he is representing you.
> THE DEFENDANT: He is not representing me.
> THE COURT: He is representing you in this case.
> THE DEFENDANT: He is not representing me."

¶ 43    Defendant's request (more of a demand, in this case) for self-representation was perfectly clear. We say this, in large part, because it was perfectly clear *to the judge*, at the time, what defendant was requesting. Without hesitation, or any further inquiry, the judge took defendant's statement to be a "request *** to proceed *pro se*, again, for the third time." And that is proof enough that the waiver was clear. See *Freeman v. Pierce*, 878 F.3d 580, 587 (7th Cir. 2017) (waiver of counsel clear and unequivocal when record showed that judge understood defendant's motion to be request for self-representation). Adding in the fact that defendant then repeatedly claimed that his lawyer was discharged—however much the judge tried to tell

him otherwise—we do not see how defendant's statements to the court could be viewed as anything but a clear request to discharge counsel and appear *pro se*.

¶ 44　　But the requirement is that the waiver of counsel be "clear and unequivocal, not ambiguous." *Baez*, 241 Ill. 2d at 116. To be sure, the phrase "clear and unequivocal" is often discussed in cases as if those two adjectives are synonymous, a legal couplet like "aid and abet," "arbitrary and capricious," "willful and wanton," or the like. We put the word "and" between the words as if they are independent requirements, but we do not really mean that. (We daresay that no court has ever held that a ruling was capricious but *not* arbitrary, that a defendant abetted a coconspirator but did not *aid* him, that a defendant's conduct was wanton but not willful.)

¶ 45　　But the phrase "clear and unequivocal" does not fall into that category. A defendant's request may be clear, but in the overall context of the proceedings, it still may be viewed as equivocal. See *Burton*, 184 Ill. 2d at 22-23 (waiver of counsel must be considered within "the overall context of the proceedings"). A defendant could clearly request self-representation, as here, but the circumstances may reveal that a defendant has constantly waffled back and forth on the matter, whether inadvertently or strategically, requesting self-representation every time a legal ruling did not go his way or every time a trial date approached, only to quickly change his mind upon being required to actually undertake his defense without a lawyer. That is not every case—it is not most cases—but in that context, the trial judge should have discretion to see things for what they are and assert some control over the matter.

¶ 46　　Indeed, in an oft-cited passage, our supreme court has written that the requirement of a clear and unequivocal waiver "prevent[s] the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *Mayo*, 198 Ill. 2d at 538. That is exactly what happened here. That was not the state of affairs in *Mayo*, where the supreme court stated that point only generally, nor has it been the fact pattern of any published decision in Illinois. Even though we have cited that phrase repeatedly in case law, we have never had reason to apply it.

¶ 47　　We do now. Our supreme court in *Mayo* relied for this oft-quoted passage on the decision in *Williams v. Bartlett*, 44 F.3d 95 (2d Cir. 1994). There, the court put a finer point on this particular topic. The court first noted, as most courts have, that one of the reasons for the clear-and-unequivocal requirement is to avoid the gamesmanship we discussed above, where ambiguity could allow the defendant to claim a sixth-amendment violation (a denial of counsel or a denial of self-representation) no matter how the trial court ruled. *Id.* at 100-01. But the court also noted as follows:

> "Of course, when a defendant changes his mind after trial begins, *or does so repeatedly at any stage*, a court may find that the conduct is manipulative or abusive in some other way. If so, the conduct can be considered vacillation, and a trial judge may find the request equivocal." (Emphasis added). *Id.* at 101.

¶ 48　　It is in that sense, then, that no matter how "clear" a defendant's request for self-representation may be, the requirement that it also be *unequivocal* "prevent[s] the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*." *Mayo*, 198 Ill. 2d at 538 (citing *Williams*, 44 F.3d at 100-01); see also *Williams*, 44 F.3d at 101 (requirement "inhibits any 'deliberate plot to manipulate the court by alternatively requesting, then waiving counsel' " (quoting *Tompkins*, 623 F.2d at 828)).

¶ 49    A defendant has the right to choose between counsel and self-representation, and he has the right (at least generally speaking) to change his mind more than once. But he does not have an evergreen right to change his election back and forth, no matter how "clearly" he conveys each successive choice to the court. *United States v. Reddeck*, 22 F.3d 1504, 1510-11 (10th Cir. 1994) (once defendant makes his election, "he does not have an unlimited right to thereafter change his mind and seek the other path of representation"); *People v. Jones*, 2015 IL App (2d) 120717, ¶ 36 ("Once a defendant is granted the right to proceed *pro se*, he does not have an unequivocal right to revoke his *pro se* status.").

¶ 50    In particular, the defendant may not play a "cat and mouse game" with the court by repeatedly demanding to change his election in pursuit of some tactical advantage to which he is not entitled; if he does, the judge may find that his request for self-representation is vacillating and abusive and thus equivocal. (Internal quotation marks omitted.) See *Reddeck*, 22 F.3d at 1510.

¶ 51    We will not try to catalog all the abusive ends to which a defendant might invoke his sixth-amendment rights. But one example of such gamesmanship is both obvious and germane to this case: delay. If a defendant could switch his sixth-amendment election whenever and as often as he liked, he could delay the trial proceedings at will and, in the extreme case, indefinitely. He could thus frustrate the effective prosecution of his case by the simple expedient of changing, or purporting to change, his mind. The rights guaranteed by the sixth amendment may not be used as a weapon to cause delay. See *Martinez v. Court of Appeal of California*, 528 U.S. 152, 162 (2000) (judicial interest in "efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *United States v. Powell*, 847 F.3d 760, 774-75 (6th Cir. 2017) (courts "balance" defendant's interest in self-representation against "delay, defense gamesmanship, and other practical concerns" (internal quotation marks omitted)); *People v. Garcia*, 2017 IL App (1st) 133398, ¶¶ 52-56 (affirming denial of *pro se* request where defendant "vacillat[ed]" between counsel and self-representation, and trial court found he "was seeking to delay proceedings by flip-flopping"); *People v. Gibson*, 2017 IL App (1st) 143566, ¶ 25 (court may deny request to revoke waiver of counsel if it finds defendant is trying to delay proceedings); *Jones*, 2015 IL App (2d) 120717, ¶ 36 (same).

¶ 52    In the postplea order, the court ruled that "Defendant did not 'clearly and unequivocally' assert his right to represent himself because he was gaming the system and trying to delay his trial ***." Elsewhere, the court referenced defendant's "constant efforts to delay the proceedings" and "obstruct his trial." The trial court, having observed defendant's conduct first-hand for more than two years, thought that defendant's third request to go *pro se* was part of a pattern and scheme to delay his trial. That finding is supported by the record and is a legitimate basis for deeming defendant's request equivocal.

¶ 53    The first two times that defendant requested to proceed *pro se*, he quickly changed his mind, requesting the reappointment of counsel at the very next hearing date. The trial court could have reasonably viewed defendant's history as impulsively dismissing counsel when things did not go his way, only to come to his senses almost immediately and reverse his election. That information, if not perhaps an independent basis for denying a third request for self-representation by itself, surely could have provided some context and color to the trial court's impression when defendant raised a third request for self-representation.

¶ 54    But more importantly, while the first flip-flop did not impact the trial date, the second one did. Recall the circumstances of defendant's second request for self-representation. After APD

Sandoval was first reappointed (following defendant's first round of waiver and revocation), he spent six months preparing for trial before defendant demanded to take over his own defense a second time—at what was supposed to be the "final" pretrial conference on September 8, 2014.

¶ 55    After demanding a second chance at self-representation, defendant immediately derailed the final pretrial conference by leaving the courtroom, refusing to participate in the hearing even after court security brought him back, and launching into a highly offensive tirade against the judge (and, to a lesser extent, his public defender). We will have more to say about that tirade later, but suffice it to say for now that the court could have reasonably construed defendant's conduct as an attempt to delay and manipulate the proceedings, among other things, by contriving a basis for the second fitness evaluation that defendant had just demanded but which the court had just denied.

¶ 56    One week after that hearing, defendant appeared *pro se* at the court's renewed attempt to hold a "final" pretrial conference and again asked for a bar association lawyer, a request the court again denied. Defendant then insisted, time and again throughout the hearing, that his trial would not proceed as scheduled, accusing the judge of "forcing [him] to trial" prematurely (if also two years since his arraignment). As defendant bluntly put it, "You got to be crazy to think I'm fittin' to start a trial."

¶ 57    After initially (and begrudgingly) acknowledging that he was still representing himself, given that he could not have a bar association lawyer, defendant later told the court that he would not proceed *pro se* any longer, that he would hire a new private attorney—who would of course need a continuance to get up to speed on the case. As the judge held firm to the trial date, defendant tried whatever other tactics he could muster to delay it, such as demanding a transfer of his case to a different judge (who would of course need time to review the extensive pretrial motions that had been filed) and continuing to demand another fitness evaluation. And defendant threw another tantrum in court—this one significantly longer and more drawn out than the first—willfully refusing, for a second time, to participate in a critical pretrial hearing, and stonewalling the judge's efforts to prepare the case for trial at every turn. (More on this conduct later.)

¶ 58    When all else failed, eight days later, defendant revoked his second waiver of counsel and asked the judge to reappoint the public defender's office. The judge agreed and, due to the delay and imposition on counsel, struck the upcoming trial date. On top of that delay, since defendant's conduct had been so egregious and unhinged, the court (against its initial instincts and perhaps out of an abundance of caution) acquiesced in the demand for a second fitness evaluation, thus delaying the trial by several more weeks.

¶ 59    In the end, defendant did not get the private attorney he wanted, but through his antics, he did manage to delay his trial.

¶ 60    So when, three months later, defendant kicked off yet *another* "final" pretrial hearing by demanding to waive counsel a *third* time, the judge had every reason to believe that he was just trying to delay his upcoming trial once more. Considering that this request was made on December 19, 2014, and given the intervening winter holidays and new year, this request was made, for all practical purposes, on the eve of the January 5, 2015, trial date.

¶ 61    Given defendant's alternating positions and the eleventh-hour timing of his request, his third demand for self-representation could be reasonably deemed vacillating and dilatory. See *United States v. Bennett*, 539 F.2d 45, 49-51 (10th Cir. 1976) (request for self-representation

vacillating where defendant repeatedly alternated between requests to represent himself and to serve as cocounsel until six days before case was set for trial). Indeed, any request for self-representation—even a first request, much less a third request—may be deemed belated and dilatory if it is made "just before the commencement of trial" or "after meaningful proceedings have begun." *Burton*, 184 Ill. 2d at 24 (citing cases).

¶ 62    Defendant contests this finding. He demanded self-representation, he says, not to delay his trial but to file a *pro se* motion to suppress. (Counsel had deemed the motion meritless and thus refused to file it.) Given its sordid history with defendant, however, the trial court could have reasonably concluded that defendant was merely using that supposed disagreement with counsel as his excuse *du jour* for a delay of the trial date.

¶ 63    We should be clear that a cautious judge should be circumspect about denying a request for self-representation—even a repeated one. If it happens early enough in the case that a defendant's flip-flopping is not delaying the trial or seriously impacting the timing of the case, a trial court should think hard about acceding to the defendant's request. The trial court did that very thing here, to its credit. But when it came to the third request for self-representation, the trial date was imminent—for the second time—and defendant's history of flip-flops and other delay tactics had reached a stage where the trial court was more than justified in putting a halt to matters.

¶ 64    In sum, the trial court did not abuse its discretion in ruling that defendant's request for self-representation was not clear and unequivocal. It may have been clear, but it was not unequivocal. We uphold the trial court's ruling.

¶ 65                                                    B

¶ 66    Given our conclusion above, we need not examine every basis on which the court found the request to be less than a "clear and unequivocal" waiver of counsel. But we would be remiss not to point out one clear error of law, if only because it keeps surfacing in the cases. The trial court found that defendant did not *really* want to represent himself because his first choice was a private attorney over an assistant public defender, with self-representation only his fallback option. The court thus viewed defendant's request for self-representation as equivocal because it was *conditional*—his second choice, not his preference. The case law has held that line of reasoning to be reversible error.

¶ 67    The record certainly supports the trial court's finding that, if defendant had his druthers, the judge would have appointed a private attorney to represent him. But a request for self-representation is not unclear or equivocal merely because it was a fallback to the defendant's first but unavailable choice of private counsel. See, *e.g.*, *Freeman*, 878 F.3d at 588-89 (granting federal *habeas* relief and rejecting Illinois courts' reasoning that self-representation request was equivocal where defendant moved to "remove or replace" public defender); *Williams*, 44 F.3d at 100 ("[A] defendant is not deemed to have equivocated in his desire for self-representation merely because he expresses that view in the alternative [and] simultaneously requests the appointment of new counsel ***."); *Adams*, 875 F.2d at 1445 ("[w]hile [defendant's] requests no doubt were *conditional*, they were not equivocal," where he "repeatedly indicated his desire to represent himself if the only alternative was the appointment of [his public defender]" (emphasis in original)); *Johnstone v. Kelly*, 808 F.2d 214, 216 n.2 (2d Cir. 1986) ("A request to proceed *pro se* is not equivocal merely because it is an alternative position, advanced as a fallback to a primary request for different counsel.").

¶ 68    That is to say, if the request for self-representation is a second choice, behind an option that the trial court cannot and will not give the defendant (the appointment of private counsel), the request for self-representation remains a clear and unequivocal request. A diner's request for the fish is no less clear or unequivocal, even if it came only after learning that her first choice of steak was sold out for the evening.

¶ 69    But that does not change the fact that we have an independent basis for affirming the trial court's judgment, and we do so.

¶ 70                                    III

¶ 71    We return now to the trial court's remark, at the time of denying defendant's request, that he was "not capable of representing [him]self." Defendant's arguments on appeal focus primarily on this statement. As defendant understands it, the court meant to convey that it was denying defendant's right of self-representation because he lacked the legal ability to conduct a defense.

¶ 72    That would be a clear legal error. The decision in *Faretta*, 422 U.S. at 835-36, clearly establishes that a request for self-representation may not be denied on that basis. And defendant's complaints are not off the mark. In the course of explaining its finding that defendant was not capable of representing himself, the trial court did say in the postplea order that defendant "failed miserably in presenting his *pro se* motions." So we must agree with defendant that concerns about defendant's legal ability were at least lingering in the judge's mind.

¶ 73    But the order made clear that the trial court also meant something very different: that defendant was "not capable of representing himself in the dignified manner expected of parties appearing before the Court, *pro se* or otherwise." And the order was not the first time the trial court made this point. In the midst of defendant's second courtroom tantrum, at the September 15, 2014, hearing, the judge remarked, "Obviously you cannot conduct yourself properly in court."

¶ 74    A defendant's lack of civility and decorum, unlike his lack of legal ability, is a valid basis for denying his request for self-representation. "The right of self-representation is not a license to abuse the dignity of the courtroom." *Id.* at 834 n.46. Thus, when a *pro se* defendant "deliberately engages in serious and obstructionist misconduct," the judge may "terminate" his self-representation. *Id.*; *People v. Rohlfs*, 368 Ill. App. 3d 540, 545 (2006). Or, by the same logic, it may deny a later request to represent himself again; the fact that the defendant had revoked his previous waiver of counsel between his misconduct and his current request should make no difference to the analysis.

¶ 75    The kind of misconduct that would justify imposing counsel on an unwilling defendant is, in essentials, the same kind of misconduct that would justify excluding him from his trial. See *Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337 (1970)); *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998). A defendant forfeits his right to be present at trial "if, after he has been warned by the judge *** he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Allen*, 397 U.S. at 343. Just as the judge may exclude a " 'disruptive, contumacious, stubbornly defiant defendant[ ]' " from his trial, so too may the judge deny such a defendant the right to continue representing himself. *Brock*, 159 F.3d at 1079 (quoting *Allen*, 397 U.S. at 343).

¶ 76　　　Forfeiture is strong medicine when the right to be nixed is a fundamental one, guaranteed by the sixth amendment. And so a trial judge must be prepared to endure at least some irritating, foolish, unprofessional, or " 'occasionally wacky' behavior" from a *pro se* defendant. *United States v. Smith*, 830 F.3d 803, 810 (8th Cir. 2016) (quoting *United States v. Johnson*, 610 F.3d 1138, 1144 (9th Cir. 2010)). A rough-around-the-edges demeanor, not at all unusual for a *pro se* defendant, will not justify a denial of this right; some unprofessionalism must be tolerated unless the defendant's conduct is so defiant, disruptive, or disrespectful that it "threaten[s] to forestall" the proceedings. *Id.*; *Brock*, 159 F.3d at 1080; see *Allen*, 397 U.S. at 343.

¶ 77　　　A defendant's pretrial misconduct, while appearing *pro se*, may justify a denial of his right to conduct his own defense. See *Rohlfs*, 368 Ill. App. 3d at 545; *Smith*, 830 F.3d at 810; *Brock*, 159 F.3d at 1079-81. But courts are especially cautious, and rightfully so, about denying a defendant's fundamental trial rights on account of his conduct *before* trial. See, *e.g.*, *Smith*, 830 F.3d at 810 (definition of misconduct should not be "unduly expanded" in pretrial context). A trial judge should not, for example, ever seriously consider forcing an unwanted attorney on an intemperate, perhaps frustrated, *pro se* defendant who lets slip an everyday profanity or two at a status hearing.

¶ 78　　　Rather, the pretrial misconduct must provide a strong indication that the defendant would continue to disrupt and forestall the proceedings, including the trial, if allowed to continue his own defense. See *id.* at 810-11 (citing cases). Thus, courts generally require a persistent pattern of pretrial misconduct, and not just a single, isolated instance, before denying a defendant the right of self-representation. Compare, *e.g.*, *People v. Sheley*, 2012 IL App (3d) 090933, ¶¶ 26-27 (one "isolated incident that transpired after the trial court's adverse rulings" did not justify denying self-representation), with *Brock*, 159 F.3d at 1081 (denial of self-representation upheld where obstructionist misconduct "persisted even after several contempt citations").

¶ 79　　　In *Brock*, 159 F.3d at 1080-81, the defendant, appearing *pro se* at multiple pretrial hearings, refused to answer the court's questions or cooperate with the proceedings, and at one point, he even "stormed out of the courtroom" when the judge issued an adverse ruling on his motion. By stonewalling the court, making it extremely difficult for the judge to resolve some pertinent pretrial matters, the defendant thus forfeited his right to represent himself. *Id.* at 1081. These factors—and more—are present here, too.

¶ 80　　　Defendant's conduct was seriously obstructionist on two occasions: the pretrial hearings on September 8 and 15, 2014, immediately after the trial court granted his request to proceed *pro se* a second time. Notably, these were the only hearings at which defendant had any substantive responsibility for conducting his own defense in court. (The first time he waived counsel, he immediately revoked his waiver at the start of the next court date.) The judge could thus take defendant's conduct at these hearings to be indicative of how he would continue to behave if allowed to proceed without an attorney to hold him in check.

¶ 81　　　Take the September 8, 2014, hearing, the trial court's first attempt to conduct a final pretrial conference. After the trial court denied defendant's request for another fitness evaluation, a request that counsel had refused to back, defendant discharged his public defender. Now *pro se*, he asked the trial court to transfer him to county jail, where he supposed he could conduct his own defense more effectively than from prison. The trial court denied that request, too. At the same time, the State tried to hand defendant copies of its motions *in limine* and proposed jury instructions, all of which were slated for argument and ruling that day. So now

- 13 -

was the time for defendant to take charge of his own defense, as he had asserted his right to do, by contesting the State's positions. Instead, like the defendant in *Brock*, 159 F.3d at 1080-81, he not only refused to cooperate with the proceedings, he left the courtroom altogether.

¶ 82 And when security brought him back, he still refused to participate meaningfully in the hearing. Quite the opposite: He launched into a tirade, hurling an onslaught of deeply offensive slurs at the judge. His public defender got much the same treatment, albeit to a lesser degree. We will let defendant's words speak for themselves:

> "THE DEFENDANT: I don't want to hear that shit, man. Fuck everybody.
>
> THE COURT: The defendant—
>
> THE DEFENDANT: Man, I ain't trying to hear that shit. I ain't trying to hear shit. I ain't trying to hear that shit he got to say. I ain't trying to hear shit he got to say. He might as well go on ahead and say what he got to say. I ain't listening to shit. Fuck out of here. I just told you.
>
> THE COURT: Additional guards from IDOC had to gather—
>
> THE DEFENDANT: Fuck you. Clown ass faggot.
>
> THE COURT: —the defendant from the back from making—
>
> THE DEFENDANT: Get your goofy ass on.
>
> THE COURT: —multiple disruptions.
>
> THE DEFENDANT: Fuck you.
>
> THE COURT: And—
>
> THE DEFENDANT: Gay ass man.
>
> THE COURT: —profanities towards the Court.
>
> THE DEFENDANT: Fuck out of here, bitch ass.
>
> THE COURT: And defendant also—
>
> THE DEFENDANT: Might as well charge me with another case. Fuck you.
>
> THE COURT: —has—it should be noted for the record that the defendant—
>
> THE DEFENDANT: I told you not to bring me back out here, man. Fuck out of here.
>
> THE COURT: That the defendant was serving his parole—
>
> THE DEFENDANT: I ain't about to finish shit. Fuck you and all these—every motherfucker in this courtroom, fuck y'all.
>
> THE COURT: —while incarcerated in Cook County jail because of additional items—
>
> THE DEFENDANT: Y'all don't want to do shit for me. A fucking week stay, get your gay ass out of here. You say deny, deny, deny every motherfucking thing I got coming. Fuck you. I don't want you to rule over shit, shit that's going on with me.
>
> THE COURT: —complaints in jail, he was taken back into—
>
> THE DEFENDANT: No taking back shit. Fuck you.
>
> THE COURT: —IDOC custody.
>
> THE DEFENDANT: Fuck on. Fucking faggot.
>
> THE COURT: Now, what was that date?

THE DEFENDANT: Monday.

THE PROSECUTOR: Monday, the 15th, Judge.

THE COURT: Motion defendant.

THE DEFENDANT: All of that for that. I just told y'all, I had my court date already. Fucking goofy. I'll never come back in this courtroom again. You might as well find me guilty right now for everything.

THE COURT: For the final pretrial conference.

THE DEFENDANT: Fuck out of here. Goofy ass people, man. Sandoval faggot ass. Y'all might as well find me guilty right here, right now. I'll never come back in this courtroom. Fuck y'all.

THE COURT: We will continue the trial whether—

THE DEFENDANT: Continue it. Find me guilty.

THE COURT: —you're here or not.

THE DEFENDANT: Fuck is you talking about. Find me guilty on every case. Give me life on every case. Fuck you, dude.

THE COURT: It appears that perhaps you are—

THE DEFENDANT: Man, fuck you, and whatever you're saying. Fuck you. You're a faggot.

THE COURT: And any condition to represent yourself, we will address that matter again on the next court date.

THE DEFENDANT: I just told you I need a psyche eval, you denied me a fucking psyche eval.

THE COURT: That is denied.

THE DEFENDANT: You fucking faggot. Fuck you and your denial. I'll never come back in your courtroom again, bitch.

THE COURT: Please understand, sir.

THE DEFENDANT: Fuck you. I ain't understanding shit. You fucking faggot.

THE COURT: If you—

THE DEFENDANT: Fuck you.

THE COURT: If you fail to come to court—

THE DEFENDANT: Fuck you. Fuck you. I ain't trying to hear that shit.

THE COURT: —we can proceed to trial in your absence, and if you're found guilty—

THE DEFENDANT: Fuck you and if found guilty. Find me guilty right now.

THE COURT: —you could be sentenced in your absence. Thank you.

THE DEFENDANT: You fucking fag. Bitch ass nigger."

And with that, the trial court adjourned for the day.

¶ 83     So defendant could hardly complain when the judge ordered him shackled the next week, on September 15, 2014, as the court tried to complete the final pretrial conference that defendant had derailed with his antics. But the shackles did little to chasten him or secure his meaningful cooperation with the proceedings.

¶ 84     It is not just that defendant insisted on sitting or standing at his own leisure, rather than as the judge told him to. Or that roughly 80 pages of transcript from the hearing are laced with his incessant profanity. More than that, defendant made it utterly clear that he had no intention of cooperating with the proceedings or showing any modicum of respect for the court. There are far too many examples of defendant's disruptive and disrespectful conduct at the hearing to discuss them all. So we will confine ourselves to a representative sample.

¶ 85     Defendant did whatever he could to stonewall the judge's efforts to resolve outstanding trial preparation matters. During the jury instruction conference, for example, defendant simply refused to answer the judge's questions. Instead, he flatly insisted, "I don't know what the fuck you are talking about." And he was at a total loss, he insisted, because the judge had put him in shackles, leaving him unable to "go through [his] paperwork." It was clear to the judge, however, that defendant could flip through the pages just fine when he wanted to. (As the judge remarked, "You just flipped them. You just handled those other papers," or "Those same hands that you keep grabbing your papers with—".) Rather, defendant was just refusing to cooperate even minimally with the proceeding. Lest there be any doubt about that, defendant put the point bluntly: "I ain't no flipping nothing."

¶ 86     Numerous times, the judge asked defendant if he had any objections to a State instruction or motion, and defendant responded that he was "objecting to everything that you're saying." When asked to provide a basis for his blanket objections—which registered little more than a continued refusal to take part in the proceeding—defendant would respond that even "If [he] did have a basis, it wouldn't mean nothing" or "[i]t don't matter" because whatever defendant might say, this "goofy" judge would rule against him anyway. So when asked, "What do you wish to do with respect to this motion?" defendant just shrugged off the question and said, "Whatever you want to do." Defendant did indicate at one point that he would be willing to "tell all my legal basis to the next judge"—the same "next judge" who would postpone the trial, or so defendant assumed—but otherwise defendant never indicated any willingness to cooperate with the court or show any respect for the judge's authority.

¶ 87     That last point bears emphasis. Defendant's conduct toward the judge was deplorable, far beyond the routine lack of polished professionalism that a judge must be prepared to tolerate from a *pro se* defendant. Sometimes defendant challenged the judge's authority point blank, as in, "You think you're even going to rule over my shit you got to be crazy." Sometimes he just mouthed off indiscriminately, at the judge and the prosecutor alike, telling one or the other of them to "fuck on," or "get the fuck out of here," or "knock it off." He complained endlessly about the judge's "bullshit." And it would be one thing if he merely interrupted the judge, but he did not stop there. When the judge calmly responded to an interruption by assuring defendant, "You'll have your chance" to ask questions, defendant met the judge's temperate response with an impertinent and disrespectful demand: "I'm asking you a question right now."

¶ 88     When the judge tried to warn defendant that his antics "won't go over well before a jury," defendant, offering a glimpse of what a *pro se* trial might look like, retorted, "I don't give no fuck about none of that you're talking about, man." When the judge admonished him that he was "disrespecting the court," defendant fired back, "You disrespect the court every day."

¶ 89     The same impudence was on full display in several longer exchanges between defendant and the judge. Consider this vignette, in which defendant had just finished cursing about his public defender being "in cahoots" with the prosecution:

"THE COURT: Sir, watch your language and I also admonish you that language will not go over well with the jury. It will not.

THE DEFENDANT: I got a freedom of speech. I can say what I want to say.

THE COURT: Well, you don't have a freedom of speech in this courtroom to say anything—

THE DEFENDANT: Shit, shit.

THE COURT: —outside the decorum of this courtroom.

THE DEFENDANT: Shit.

THE COURT: And if necessary—

THE DEFENDANT: That would be crazy. If y'all think y'all fittin' to railroad me, y'all crazy. Y'all crazy.

THE COURT: If you continue to act out—

THE DEFENDANT: I'm not continuing. You're the one acting out.

THE COURT: —then you will—

THE DEFENDANT: You're the one acting out.

THE COURT: You will be taken in the back and the trial will proceed in your absence.

THE DEFENDANT: What the fuck you talking about acting out? You acting out. Denied, denied, denied. Every time the State come up with something it's granted.

THE COURT: So we will proceed in your absence. Make no mistake about it.

THE DEFENDANT: I ain't make nothing mistake.

THE COURT: Okay.

THE DEFENDANT: What the fuck you talking about?"

¶ 90    Or take this exchange, in which defendant had just insisted on transferring his case to a different judge, one who would grant his request to delay the trial date:

"THE COURT: That request is also denied.

THE DEFENDANT: I know it's denied. So you're not fittin' to just rush me to trial on your behalf, man, 'cause—

THE COURT: We're going to proceed to trial.

THE DEFENDANT: Ain't no proceeding, shit. You're proceeding on your own.

THE COURT: Well, whether you're here or not we're proceeding.

THE DEFENDANT: We nothing. What you talking about we? I just told you the way it is. I'm fittin' to hire an attorney. What the fuck you talking about?

THE COURT: Attorney needs to be here ready, willing and able to proceed to trial.

THE DEFENDANT: Ain't no ready. He's going to go over these cases with me like he's supposed to. Talking about September 29th. I supposed to start a trial last year September 29th.

THE COURT: That's why you're definitely starting now.

THE DEFENDANT: I ain't definitely starting shit.

THE COURT: Please also remember, sir, if you're found guilty—

THE DEFENDANT: Ain't no guilty. You're going to find me guilty even if the jury don't find me guilty. You're going to overrule and still find me guilty, man.

THE COURT: I can't overrule a jury.

THE DEFENDANT: What are you talking about? Knock it off.

THE COURT: With respect to that if the jury finds you not guilty, then you would be not guilty. If the jury finds you guilty, it would be this Court that's doing the sentencing.

THE DEFENDANT: I don't give no fuck about no sentencing, man."

¶ 91   Lastly, defendant openly mocked the seriousness of sexual assault, an offense of which he was accused. As he put it in one outburst, while interrupting the prosecutor who was seeking leave to amend the indictment: "20 years for some—you saying I put my fingers in something. 20 years? Knock it off, man. Get the fuck out of here." That "something," as the prosecutor's recitation of the charging language had just made clear, was of course the victim's vagina.

¶ 92   We could continue, but we will leave it at that. To recap: Defendant refused to cooperate even minimally with the court. He obstructed and stonewalled the proceedings, refusing to answer the judge's questions and going so far as to leave the courtroom, thus requiring the judge to shackle him at the next hearing, a remedy that had little effect beyond keeping him in the courtroom. His verbal assaults against the judge personally, as well as the authority of the court, were relentless and sometimes deeply offensive. He showed no respect whatsoever for the court or any of its officers. He openly disparaged the seriousness of sexual assault. And he devolved into these antics not once, but at two separate hearings—and more to the point, *every* time he was in charge of his own defense.

¶ 93   So when defendant demanded to represent himself yet again, the judge could rightfully expect more of the same. Defendant would derail another motion hearing. Worse yet, he would continue his defiant, disruptive, and deeply disrespectful antics at his trial, in front of a jury. The judge, having warned defendant that his conduct was jeopardizing both his right to be present at his trial and his right to conduct his own defense, was well within his rights to say that enough was enough. Defendant's misconduct was "serious and obstructionist" indeed, and the trial court could rightfully deny his request for a third go at self-representation on this basis.

¶ 94   Thus, even if defendant's third request for self-representation was unequivocal (it was not, for the reasons above), we would affirm the court's judgment for the additional reason that defendant had given the court every reason to believe that his self-representation at trial would significantly impugn the integrity of the proceedings. The trial court was not required to turn its courtroom over to a defendant who threatened to turn it into a three-ring circus.

¶ 95                                    CONCLUSION

¶ 96   The trial court should be commended for its patience and its steadfast attempt to remain focused and protective of defendant's rights, notwithstanding seriously abusive conduct by defendant. And while, as defendant notes, perhaps not every basis given by the trial court for denying defendant's third request for self-representation was supported by the law, we have no hesitation in finding ample grounds to uphold the trial court's judgment.

¶ 97   The judgment of the circuit court is affirmed in all respects.

¶ 98   Affirmed.